Filed 11/3/22  Leroy C. v. Sarah T. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LEROY C.,<br><br>    Respondent,<br><br>    v.<br><br>SARAH T.,<br><br>    Appellant. | B305384, consolidated with B307120, B310080, B314681<br><br>(Los Angeles County Super. Ct. No. BF034698) |

APPEAL from the orders of the Superior Court of Los Angeles County, Lynn H. Scaduto, Judge.  Affirmed.

Law Offices of J. Ellie Sweeney and J. Ellie Sweeney; Heather M. Patrick; Complex Appellate Litigation Group, Claudia Ribet, Jessica M. Weisel, and Kelly Woodruff for Appellant.

Holstrom, Block & Parke, Ronald B. Funk, and Samantha K. Pruett for Respondent.

\* \* \* \* \* \*

After an 11-day evidentiary hearing, a family court modified an existing custody order that had granted the parents of a now 14-year-old girl split custody to give the father full legal and physical custody and to severely limit the mother's interactions with the girl to a few hours of conjoint therapy each month. The court's 37-page written order detailed its view that the girl was endangered by the mother's years-long campaign of repeatedly falsely reporting that the father had abused the girl, each report of which touched off a procession of examinations, interviews, court proceedings, and therapy. The court also granted the father's subsequent request to move with the girl to Virginia. The court then awarded sanctions against mother for making false allegations and frustrating the policy of the law to promote the settlement of litigation. Mother launches a multifarious attack on all of these orders. Because her arguments lack merit, we affirm all of the family court's orders.

## FACTS AND PROCEDURAL BACKGROUND

### I.     The Family

Sarah T. (mother) and Leroy C. (father) have one child, Shyla. Shyla was born in California, in July 2008.

### II.     Mother Initially Has Sole Physical Custody of Shyla, and Repeatedly Accuses Father of Abusing Shyla

Around the time Shyla was born, father filed a petition to establish his parentage. For the next four years, father lived in Virginia while mother and Shyla remained in California. Father moved to California in 2012.

2

Soon after father moved to California, mother sought a restraining order to protect herself and Shyla on the ground that Shyla told her that father had sexually molested her. Mother said she sought the order "[a]t the instruction" of law enforcement. Father vehemently denied the allegations. Hedging its bets, the family court denied a restraining order protecting Shyla, but awarded mother sole legal and physical custody of Shyla, limited father's visits to monitored visits, and issued a one-year order protecting mother.

In November and December 2015, mother filed petitions alleging that father was again sexually molesting Shyla and asking to restrict his visitation rights as a result. Although the family court in November 2015 denied the first petition outright on the ground that the allegations of sexual abuse had been previously rejected and were being recycled, the court by December 2015 opted again to hedge its bets by ordering father's visits to be monitored by a professional monitor "as a precaution."

## III.  Supervision by the Juvenile Dependency Court

In 2015, the juvenile court exerted dependency jurisdiction over Shyla after finding that mother and father had "engaged in a custody dispute regarding the child in which the mother made numerous allegations of sexual abuse of the child by father," which prompted multiple interviews and examinations of Shyla, causing Shyla to "exhibit[] severe emotional issues including anxiety [and] vomiting" that "endanger[ed]" her physical and emotional health. The juvenile court terminated its jurisdiction in August 2018 with a so-called "exit order" granting mother and father joint legal and physical custody with equal parenting time. The product of a stipulation, the exit order was very detailed: It set forth how Shyla was to be exchanged each Friday, how both

3

parents were required to permit Shyla to compete in gymnastics, how the parties would need each other's consent to deviate from the exit order's terms, and how that consent was not to be "unreasonably with[held]."

## IV. November 2020 Order Awarding Father Sole Physical and Legal Custody of Shyla

### A. *Mother again accuses father of abuse, and obtains ex parte orders keeping Shyla away from him over the Christmas 2019 holiday*

Two weeks after father filed a petition seeking to have mother stop picking up Shyla from school and gymnastics practice in violation of the exit order's terms, and just days before father was to have Shyla visit over the Christmas 2019 holiday, mother sought an emergency protective order and a no-notice temporary restraining order (TRO) that kept Shyla in her custody over the holidays on the ground that father was subjecting Shyla to physical abuse.

In January and February 2020, the court convened a four-day evidentiary hearing on mother's requests to convert the TRO into a permanent restraining order and to grant her full custody. The parties called six witnesses, including both parents and Shyla. Shyla's testimony at the hearing painted a sharp contrast between mother and father. Mother, Shyla said, was simply "awesome." Father, however, was "aggressive" and downright cruel: He would "randomly jump" on her; would "slap," "punch" and "choke[]" her; would "stick [stuff] up [her] nose . . . or in [her] ear" like rolled up post-it notes; would "poke [her] eye[s]"; would fill her shoes with "ants" and "eggs"; and would send her "to school with shoes that were three sizes too small" so the pain would be a constant reminder that he was in charge. However,

4

there was no contemporaneous corroboration of any of this abuse and no contemporaneous reports of this abuse; instead, there were photos and videos of Shyla and father smiling together, although Shyla explained that she was smiling and laughing only because father pinched and threatened her with bodily harm if she did not play along. Mother claimed to have videos and photos documenting Shyla's injuries and "anxiety attacks," but said she no longer had them because the social workers she interacted with during the dependency case had told her not to keep such documentation and because her phone with all those videos and photos had been stolen under "questionable" circumstances. Mother said she filed a petition to stop father's alleged abuse of Shyla only after the police officer who helped mother get an emergency protective order told mother to do so, as she feared father would "twist[]" mother's act of filing a petition—which she viewed as yet another example of her "being a loving and thoughtful mother"—against her.

Father testified, explaining how Shyla seemed to have a Jekyll/Hyde toggle: When Shyla was with father and out of mother's sight, they had a strong and loving relationship; but once Shyla was in mother's presence, Shyla would accuse father of mistreatment and treat him with disdain, in what father surmised was an attempt to remain in mother's good graces.

On February 3, 2020, the family court denied mother's requests for a permanent restraining order and for full custody, and dissolved the previously issued TRO. The court found Shyla and mother were not credible witnesses. In rejecting their testimony, the court "found it impossible to reconcile Shyla's uncorroborated account of her father as malevolent and controlling with the other evidence" before the court, such as

video footage and witness testimony showing that father and Shyla had a sweet dynamic, that Shyla was never fearful around father, and that Shyla had no injuries. The court also noted its observation of mother's "pattern" of not taking personal responsibility for what amounted to a false filing and, instead, of "going out of the way to promote the idea that she was simply following the commands of law enforcement" in filing for a restraining order. The court also noted how the TRO application appeared to be in retaliation for father's earlier filed petition, and how it was "strategically timed" to "disrupt [father's] plans with [Shyla] for the upcoming Christmas holiday."

The family court awarded father $8,539 in attorney fees for prevailing in the restraining order proceeding.[1]

**B.    *Family court issues interim custody order***

On the same day it denied mother's requests for a restraining order and full custody, the family court also ordered that Shyla be placed in father's sole physical custody "in light of the duration" of time that the TRO was in effect and kept Shyla away from father, until father's pending petition was resolved which was set for three weeks later, on February 25, 2020.

**C.    *Father's request to modify the custody arrangement in the exit order***

Although father's initial petition (which triggered mother's initiation of restraining order proceedings) sought only to "restrain[]" mother from "picking up [Shyla] during father's custodial time" and to grant father "tie breaking authority" when it came to decisions about Shyla, father in his opposition to

---

1    Mother filed a notice of appeal from this attorney fees award, but raises no challenge to it in her briefing on appeal and, therefore, has abandoned that appeal.

mother's request for a restraining order effectively amended his petition to seek sole legal and physical custody of Shyla.

The family court convened an evidentiary hearing on father's request over the course of 11 days spread out over five months in 2020. Although mother at one point expressed an intent to call 47 witnesses, mother eventually pared it down to eight witnesses and a 28-page, 103-paragraph declaration of her own. The court ultimately denied mother's request to call Shyla as a witness in these proceedings, finding that Shyla's likely testimony would be "cumulative of things that the court has already heard" and that the "detriment" to Shyla for having to testify again "could be very significant."

As the evidentiary hearing progressed, the family court rejected mother's repeated requests (in April and June 2020) to revert to a 50/50 custody arrangement or to award mother sole custody of Shyla, ruling that mother's further claims of abuse by father were based on nothing more than "speculation, hyperbole and mysteriously sourced evidence that the court did not find credible or convincing." For example, the photos of Shyla's fingers that mother submitted in support of the June 2020 request as proof that Shyla was self-mutilating while in father's care ended up being nothing more than Shyla's fingers being wrinkled from too much time spent in a swimming pool on a playdate. In light of the danger that granting mother even partial custody of Shyla would result in the manufacture of even more false evidence of abuse, the court limited mother's contact with Shyla to monitored visits during the pendency of the hearing.

The evidence adduced at the evidentiary hearing was similar to the testimony adduced during the restraining order

proceedings. Mother testified that father had been abusing Shyla "for years," but mother never reported any of that abuse to the authorities and instead would wait to act until someone else— whether social workers or police—*told* her to go to court to protect Shyla. The evidence also indicated that Shyla would act "extremely emotional" in condemning father and in pining for more time with mother when mother was present, but was affectionate and comfortable with father when mother was not around. The evidence also documented several instances in which mother failed to comply with the exit order's 50/50 custodial arrangement, particularly when it came to ensuring that Shyla attended gymnastics events—even when Shyla was ill or injured.

In November 2020, the family court issued a 37-page written order granting father sole legal and physical custody of Shyla, with mother limited to three hours of visitation per month to take place at conjoint therapy with Shyla (the custody order). The court made two central findings. First, the court found that there had been "a material change in circumstances" since the exit order. Specifically, the court noted that the "underlying premise" of the exit order was *both* parents' "willingness and ability . . . to co-parent," and that this circumstance had changed because "mother appears to have abandoned any pretense of being willing and able to co-parent with father" and is instead "intent to thwart father's exercise of his custody rights and his relationship with" Shyla. Second, the court found that granting father sole custody was in Shyla's "best interest" because "mother shows no signs of relenting in her efforts to increase her control over [Shyla] and disrupt her relationship with father" and that "limiting and regulating [Shyla's] contact with mother appears to

8

be the only hope for [Shyla] to know some peace and to escape the role she has fallen into of saying the things she thinks will please her mother, whether true or not." Regular visitation, whether unsupervised or supervised, the court found, was "insufficiently protective of [Shyla]" because, during monitored visits over the summer of 2020, Shyla "fell immediately back into old patterns of flattering mother and denigrating father, precipitating more law enforcement and [social agency] investigations."

The family court cited three categories of evidence in support of its finding that mother was now intent upon disrupting Shyla's relationship with father rather than coparenting with father.

First, mother was herself making "false statements" and otherwise serving as a "reliable source of misinformation during" the post-exit order court proceedings; the court then catalogued several of mother's lies.

Second, mother was manipulating Shyla into "believ[ing] that she would be better off without father in her life," which is why Shyla was "depict[ing mother] as perfect" and lavishing "effusive praise" and "fervent flattery" on mother, while vilifying father as "almost cartoonishly malevolent." Shyla's "perception of her father," the court noted, "was being shaped by someone far more sophisticated than [Shyla]."

Third, mother was using "deception and manipulation" to try to make it look like *she* was not the one trying to disrupt Shyla's relationship with father. Mother was "hiding behind [Shyla] and others, surreptitiously pulling the strings to stir up investigations that put father on the defensive and disrupt [Shyla's] relationship with him unless 'concerns' about [her] safety can be dispelled." The court then catalogued five of the

9

"tactics" it had observed mother using to conceal her central role in originating the false claims of abuse by father and to deflect the liability for doing so elsewhere: (1) mother would attempt to corroborate her own testimony by reporting what *other people* had said about the abuse Shyla was allegedly suffering, but those people—when called as witnesses—would not actually corroborate mother, (2) mother would characterize herself and Shyla "as victims of 'the system,'" as a means of "elicit[ing] sympathy or guilt" and to "circumvent questions . . . about [mother's] own veracity and motives," (3) mother would try to "turn the tables" by accusing anyone of misconduct if they "question[ed] the propriety of [mother's] conduct," including accusing father and the county's social services agency, (4) mother would "accus[e] father of her own [mis]deeds," such as when she accused *father* of trying to drive a wedge between her and Shyla, of being "crafty," and of "cherry pick[ing]" parts of the record in this case, and (5) mother would "sow[] enough doubt and confusion that [a] court [hearing mother's allegations] will give up on trying to discern the truth and instead just hedge against the potential risk to [Shyla]."

## V.    Sanctions Order

In December 2020, the family court awarded father $34,414 in sanctions against mother under two different statutes (the sanctions order).[2]  Specifically, the court awarded (1) $21,375 in sanctions under Family Code section 271,[3] after finding that

---

[2]    This amount is a small fraction of the $375,000 father sought.

[3]    All further statutory references are to the Family Code unless otherwise indicated.

mother's conduct in filing protracted court proceedings—while denying any responsibility for doing so—frustrates the policy of the law to reduce the cost of litigation, and (2) $13,039 in sanctions under section 3027.1 for "knowingly [making] false allegations of abuse in connection with" the restraining order proceedings and June 2020 request for sole custody.

## VI. Move-away Order

In May 2021, father filed a request with the family court to allow him to move with Shyla from California to Virginia because father's employer transferred him to a new position in Virginia. In response, mother (1) opposed the request on its merits, and also sought a new split custody arrangement, (2) requested appointment of counsel for Shyla or a custody evaluator, and (3) demanded an evidentiary hearing with at least nine witnesses. In support of her opposition, mother submitted a declaration (1) attesting to how during their conjoint therapy sessions, Shyla "cried hysterically," "hyperventilat[ed]," and "plead[ed]" to remain in California and to return to mother's full-time custody; (2) indicating her belief that father and Shyla share a home in Virginia with a convicted murderer recently released from prison; and (3) attesting that the geographically nearest school in Virginia was poor quality. Mother also submitted the declarations of several other individuals espousing their belief that mother is a "wonderful" and "good" "mother," that the social services agency was fabricating evidence against mother, that father was a bad influence on Shyla and that Shyla does not enjoy living with father, and that Shyla's friendship with her friends in California would suffer.

The family court convened a hearing on father's motion in July 2021. At the outset of the hearing, the court observed that

11

mother's proffered declarations appeared to be seeking to relitigate the custody order, that many of mother's proffered declarants had been witnesses in the 11-day hearing, and that appointing a custody evaluator would "basically insert a third party into the parent-child relationship." In the court's view, the chief issue was whether moving Shyla to Virginia would cause her "detriment." After mother's counsel conceded that mother was the "primary witness" on that issue, the court allowed mother to testify. Mother largely repeated what was in her declaration.

The family court subsequently issued a written order (the move-away order) granting father's request for permission to relocate Shyla, and denied mother's request for a further evidentiary hearing or for the appointment of minor's counsel or a custody evaluator. Specifically, the court noted that the "question . . . actually before the court" was "whether relocation will detrimentally affect [Shyla], her rights or her well-being"; that mother's testimony and the other declarations "amount[ed], at best, to a[n insufficient] showing of 'detriment in the abstract'" and thus did not constitute a "prima facie showing of detriment" sufficient to trigger mother's right to a more fulsome evidentiary hearing; and that, "in light of [its ruling]," appointing counsel for Shyla was not in her best interest and appointing a custody evaluator would not be helpful to the court.

## VIII. Appeals

Mother filed timely notices of appeal from the family court's custody, sanctions, and move-away orders.[4] This court consolidated the appeals.

---

[4]     Mother also filed a notice of appeal from the family court's February 3, 2020 order denying her requests for a restraining

12

**DISCUSSION**

In this consolidated appeal, mother argues that the family court erred (1) in granting father full legal and physical custody of Shyla, while limiting mother to visits during conjoint counseling; (2) in imposing sanctions against her, and (3) in granting father permission to move with Shyla to Virginia.

## I.  Custody Order

Because the August 2018 exit order constituted a custody order, the family court could modify that order only if it found that (1) "there has been a significant change of circumstances since the juvenile court issued the [exit] order," and (2) "modification of the order is in the best interests of the child." (Welf. & Inst. Code, § 302, subd. (d); *Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1164 [so noting]; see also *In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 956 (*Brown*) [noting same standard applies whenever there is a prior custody order]; *Burchard v. Garay* (1986) 42 Cal.3d 531, 535 [noting this rule is "based on principles of res judicata"].)  We review a trial court's order modifying custody for an abuse of discretion (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255; *In re Marriage of C.T. & R.B.*

---

order and sole custody, but she has abandoned any challenge to that order on appeal.  Her abandonment of this issue would seem to encompass her passing complaint that the family court violated section 3042, subdivision (f)(1), by requiring Shyla to testify during the restraining order hearings in open court (rather than in chambers) without first making an express finding that doing so was in her best interest.  Even if we ignore that mother was the one who called Shyla without requesting an in-chambers investigation, mother does not explain how she was prejudiced by any such "error" when mother does not attack the correctness of the resulting order.

(2019) 33 Cal.App.5th 87, 96-97 (*C.T.*)), and review any subsidiary factual findings for substantial evidence and any subsidiary legal questions de novo (*Shoen v. Zacarias* (2019) 33 Cal.App.5th 1112, 1118-1119). In light of the public policy favoring "continuity and stability in custody arrangements" (*In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1093 (*LaMusga*)), "appellate courts are less reluctant to find an abuse of discretion when custody is changed than when custody is originally awarded." (*C.T.*, at p. 97.)

Although mother brands the custody order "unconscionable" and "shocking to the sense of justice," those hyperbolic labels do not assist us in examining the two clusters of arguments mother actually makes—namely, that (1) the custody order is invalid on its merits, and (2) she was denied due process.[5]

---

[5] For the first time in her reply brief and again at oral argument, mother argues that the family court should never have held an evidentiary hearing in the first place because father never made a threshold prima facie showing of changed circumstances. Aside from being waived because it was not raised in mother's opening brief (e.g., *Old East Davis Neighborhood Assn. v. City of Davis* (2021) 73 Cal.App.5th 895, 915), this argument also lacks merit because the restraining order proceedings that immediately preceded the evidentiary hearing on father's motion put before the court more than sufficient evidence of mother's attempts to sabotage father's custodial rights in a manner inconsistent with the 2018 exit order. The court was not required to make an express factual finding in this regard. (E.g., *In re Marriage of Pasco* (2019) 42 Cal.App.5th 585, 591-592 [upholding implied finding of prima facie case of changed circumstances based on evidence presented to the court in a related proceeding].)

14

### A.    *Validity of custody order on its merits*

Mother argues that the custody order is invalid on its merits because (1) the family court never made an express finding of a change in circumstances, (2) even if the court made such a finding, it is unsupported by substantial evidence and incorrect as a matter of law, and (3) substantial evidence does not support the family court's finding that awarding father sole custody of Shyla is in her best interests.  Because the first argument ignores the family court's explicit finding of "a material change in circumstances" since the exit order, we turn to mother's remaining arguments.

#### 1.    *Validity of finding of changed circumstances*

Substantial evidence supports the family court's finding that there has been a change in circumstances since the exit order issued in August 2018.  The court delineated *what* the change in circumstances was—namely, that mother had gone from expressing a "willingness and ability . . . to co-parent" to effecting her "intent to thwart" father's "custodial rights."  The court then explained *how* the evidence supported its finding of mother's changed intent—namely, that mother was making false statements and planting misinformation, that she was manipulating Shyla into making a never-ending stream of false complaints about father's treatment of her, and that mother used deception and manipulation to try to make it appear that the source of the complaints against father was anyone but herself.  Although mother asserts that the court's recitation was based on nothing more than "beliefs and assumptions" without any evidence, the court's written order details which false statements mother has perpetuated, cites Shyla's testimony and contradictory evidence to explain how Shyla's attitude toward

15

father changes the instant mother is within earshot, and gives example after example from the court record of how mother has tried to orchestrate her campaign against father from behind the scenes.

Mother does not attack this evidence head on, as doing so would be incredibly difficult given that we are obligated to view the record in the light most favorable to the family court's findings when assessing those findings for substantial evidence. (*In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 40.)  Instead, mother offers four reasons why, in her view, the evidence the family court relied upon is insufficient *as a matter of law*.

First, mother argues that the family court's finding of changed circumstances is invalid as a matter of law because it rests on mother's interference with father's custodial rights, and such interference can *never* constitute a changed circumstance warranting a change in custody.  For support, she cites *Jane J. v. Superior Court* (2015) 237 Cal.App.4th 894 (*Jane J.*) and *C.T.*, *supra*, 33 Cal.App.5th 87.  Mother is wrong.  Several cases have confirmed that a court has the "power to transfer custody or otherwise modify [a] custody" order if one party "attempt[s] to frustrate" the other's "visitation rights."  (*In re Marriage of Ciganovich* (1976) 61 Cal.App.3d 289, 293-294, superseded by statute on another ground as stated in *In re Marriage of Carlson* (1991) 229 Cal.App.3d 1330, 1335; *Fay v. Fay* (1938) 12 Cal.2d 279, 282 [same].)  Neither *Jane J.* nor *C.T.* support mother's proposition that one parent's interference with the other's rights can never constitute changed circumstances.  Both of those cases involved a parent who was attempting *both* to obtain full custody of the child *and* to move away at the same time; this "double-barreled change" sets an "'admittedly very high'" "standard of

16

proof." (*Jane J.*, at p. 905; *C.T.*, at pp. 103, 105.)  All that *Jane J.* and *C.T.* noted was that a showing of one parent's attempts to frustrate the other's custodial rights and to interfere with their relationship was not enough, by itself, to satisfy this "double whammy" standard.  (*Jane J.*, at pp. 903-904; *C.T.*, at p. 103.)  At the time of the custody order in this case, father was only seeking to change custody; he was not simultaneously seeking to move away with Shyla.[6]  As a result, the elevated standard in *Jane J.* and *C.T.* does not apply.

Second, mother argues that even if one parent's interference with the other's custodial rights *can* constitute a change in circumstances sufficient to justify modifying a custody order, there was no change here because mother has been engaged in a campaign to interfere with and obstruct father's rights *since 2012*.  While admittedly clever, we reject this argument because mother nevertheless stipulated to the exit order, the terms of which were very much premised on mother's willingness to reform herself and to cooperate with father in coparenting Shyla.  The fact that mother may have been secretly harboring an intent to violate that exit order at the moment she signed it does not somehow immunize her from the consequences of her continued efforts to violate that order.

Third, mother argues that father's three main showings of interference—namely, (1) mother's conduct in picking up Shyla from school four or five times, (2) mother's conduct in filing

_____

[6]     The fact that father sought to move away the next year at the behest of his work does not alter our analysis because we evaluate the propriety of an order at the time it is issued, not based on events that occur afterwards.  (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.)

frivolous motions for changes in custody, and (3) mother's conduct in making and/or orchestrating false allegations of abuse—do not constitute substantial evidence justifying a change in custody over Shyla.

Mother urges that father's initial request in December 2019 addressed only mother's conduct in picking up Shyla from school and gymnastics a few times when it was not her turn, which is insufficient to justify giving father sole custody of Shyla. This argument ignores that no matter how narrow father's initial request might have been, that request—by virtue of father's amendment to seek sole custody as well as mother's request to call 47 witnesses—ballooned into a massive 11-day evidentiary hearing regarding the full range of conduct between the parents. We reject the notion that we must conclude substantial evidence does not support the family court's order once we ignore all of the evidence presented in this case.

Mother urges that the repetitive and meritless motions she filed cannot be used against her in assessing whether she was trying to interfere with father's custodial rights because (1) she had a right to file those motions, and (2) she lost all of them anyway. As the very existence of the vexatious litigant statutes indicate (Code Civ. Proc., § 391 et seq.), a party's litigation tactics may be used against them, even if (and, indeed, *especially if*) they lose every time.

Mother urges that her conduct in seeding misinformation and manipulating Shyla into making false reports of abuse by father cannot support the family court's finding of a change in circumstances. To begin, mother urges that the Family Code has three specific provisions that address what happens when a parent makes a false allegation—namely, (1) section 3022.5,

18

which *obligates* a family court to modify a custody order when one parent is "convicted" of "falsely accusing" the other parent of "child abuse" (§ 3022.5), (2) section 3027.5, which empowers a family court to restrict a parent's custody or visitation "if the court finds substantial evidence that the parent" knowingly made a false "report of child sexual abuse" "with the intent to interfere with the other parent's lawful contact with the child" (§ 3027.5, subd. (b)), and (3) section 3027.1, which empowers a family court to grant "reasonable money sanctions" if a parent knowingly makes a "false" "accusation of child abuse or neglect" (§ 3027.1)—which, by negative implication, preclude the court from considering a parent's false allegation in any situation not addressed in those three statutes. Although we recognize that the maxim "*[e]xpressio unius est exclusio alterius* means that 'the expression of certain things in a statute necessarily involves exclusion of other things not expressed'" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391, fn. 13), that maxim is merely a guide and, more to the point, does not generally apply "to an entire code" (such as the Family Code) (*In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1411). We decline to interpret our Legislature's specification of three special consequences applicable when a parent makes false allegations of abuse as an implicit mandate that such allegations are utterly *irrelevant* in every other situation. (Cf. Evid. Code, § 351 ["Except as otherwise provided by statute, all relevant evidence is admissible."].) Mother next asserts that there is insufficient evidence that she orchestrated Shyla to make *false* accusations of abuse because the police officer from whom mother sought an emergency protective order in December 2019 believed Shyla's report of abuse, and courts should be reluctant to discourage

19

parties from reporting abuse. This assertion just means that mother trained Shyla to lie *convincingly*, not that the lies were true. And there is no policy favoring the making of *false* police reports; in fact, to do so is a crime (Pen. Code, § 148.5, subd. (a)). Mother then asserts that the family court never expressly found that the allegations of abuse were false. This assertion ignores the entire tenor of the court's order and its express finding that mother was a "source of misinformation," that Shyla was making false reports of abuse, and that mother was using a variety of tactics to conceal that she was the source of those reports constitute an *implied* finding that mother was making false allegations of abuse *through Shyla*. (E.g., *Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 313 [substantial evidence review obligates appellate courts to imply findings].)

        2.     *Validity of finding that transfer to father's sole custody is in Shyla's best interest*

Substantial evidence also supports the family court's finding that placing Shyla in father's sole legal and physical custody (and with only therapeutically supervised visits for mother) is in Shyla's best interest. The court laid out the long history of mother's relentless attempts to "increase her control over [Shyla] and disrupt her relationship with father," explained how mother's interactions with Shyla (even if monitored) prompts Shyla to revert to the default mantra of "mom is angelic, dad is demonic" that is a product of Shyla's supervision by mother, and how "the only hope" to "escape [this] role" and to end the seemingly endless cycle of false reports of abuse/investigation/litigation—and to give Shyla "peace"—was to place Shyla with father and to deny mother the opportunity to

20

stir up more mischief. (See *LaMusga, supra,* 32 Cal.4th at p. 1085 [family court may consider one parent's actions to alienate child from other parent in determining custody].)

Mother attacks the family court's reasoning with what boil down to three categories of arguments.[7]

First, mother argues that the family court effectively terminated her parental rights without giving sufficient weight to the "paramount" public policy interests of "ensur[ing] that children have frequent and continuing contact with *both* parents" (§ 3020, subd. (b), italics added) and of "continuity and stability in custody arrangements" (*Brown, supra,* 37 Cal.4th at p. 956). While a family court is certainly to give weight to these public policy interests, those interests are not invariably controlling; instead, they may be overcome by evidence that allowing continuity of the existing custody arrangement and that ensuring both parents have frequent contact would not be in the child's best interest. (§ 3020, subd. (b) [frequent contact not required "when the contact would not be in the best interests of the child"]; *LaMusga, supra,* 32 Cal.4th at p. 1088 [policy interests do "not limit" family court's discretion to determine what custodial arrangement is in child's best interests]; *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 34 [same].) To the extent mother argues that a family court may *never*—as a matter of law—issue an order limiting a parent to seeing her child only during conjoint therapy, we disagree. Although the family court's custody order

---

[7] For the first time in her reply brief, mother argued that the family court lacked the authority to impose conjoint therapy "indefinitely." Because mother waited until her reply brief to raise this issue and has not provided good cause for this delay, she has waived it. (*Aerotek, Inc v. Johnson Group Staffing Co., Inc.* (2020) 54 Cal.App.5th 670, 685 (*Aerotek*).)

21

in this case drastically limited mother's right of access to Shlya, the court was presented with a drastic situation where mother's longstanding psychological manipulation of Shyla had caused Shyla to have a Jekyll/Hyde response to father and where the court's prior efforts to impose the less drastic remedy of monitored visits had proven ineffective because they did not stop mother's persistent conduct; we decline to hold that a family court is powerless to issue a custody order in such an extreme case where it is most needed. To the extent mother argues that the family court should have struck a different balance between these public policies and Shyla's best interests, she is asking us to exercise our discretion differently than the family court, which is an exercise beyond our power under an abuse of discretion standard of review. (E.g., *People v. McGlothin* (1998) 67 Cal.App.4th 468, 477.)

Second, mother argues that the family court ignored all of the witnesses who offered their opinions that Shyla would be worse off in father's custody. The family court did not *ignore* them; it simply rejected their opinions, which is within its right to do when sitting as a finder of fact. We may not reevaluate the trial court's assessment of those witnesses' credibility or otherwise reweigh the evidence. (*People v. Brown* (2014) 59 Cal.4th 86, 106 ["'We do not reweigh evidence or reevaluate a witness's credibility.'"]; *In re Marriage of Battenburg* (1994) 28 Cal.App.4th 1338, 1343 [same].)

Third, mother argues that the family court omitted the following issues from its order—namely, (1) the court did not making a finding that father would be more likely to allow mother to have contact with Shyla, (2) the court did not explain why it was necessary to limit mother's contact with Shyla, and (3)

22

the court did not explain why it was necessary to limit that contact to merely three to six hours per month. Regarding the first issue, whether father is more likely to interfere with mother's contact with Shyla is of limited importance given the court's order that mother's contact is to be limited to three hours of conjoint therapy a month; further, the court found that Shyla had a good relationship with father (outside of mother's presence) and that father's litigation history revealed no pattern by father of doing anything more than trying to protect his own parental rights under the exit order (rather than trying to interfere with mother's rights). Regarding the second issue, mother overlooks the family court's explanation—recited above—as to why more visitation with mother and visitation in anything less than therapeutic setting would be detrimental to Shyla. And mother objects to the *length* of the conjoint therapy each month for the first time in her reply brief; by waiting to do so, she has waived this argument. (*Aerotek*, *supra*, 54 Cal.App.5th at p. 685.)

## B. *Violation of due process*

The constitutional guarantee of due process applies in family court proceedings, including child custody proceedings. (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1368; *Fewel v. Fewel* (1943) 23 Cal.2d 431, 433-434.) Among other things, a party's right to due process includes the corollaries that the family court cannot be affected by actual bias against a parent or a "probability of bias . . . so great as to become 'constitutionally intolerable'" (*People v. Freeman* (2010) 47 Cal.4th 993, 1001), cannot prejudge a case and must keep an "open mind" until all the evidence is presented (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 290-291; *Rosenfeld v. Vosper* (1941) 45 Cal.App.2d 365, 371), and cannot act as an advocate for either

23

party (and should instead be neutral) (*Lois R. v. Superior Court* (1971) 19 Cal.App.3d 895, 897-898, 903).

Mother asserts that the proceedings resulting in the custody order violated due process for what can be grouped into three reasons.

First, mother argues that the family court was biased against her because it devoted 16 of the 21 pages of facts in its 37-page order to facts that, in mother's view, disparaged her. This is not bias for the simple reason that the court's findings were based on the evidence before it. A judicial "opinion . . . formed" as "the result of a judicial hearing" "does not amount to [improper] bias and prejudice." (*Kreling v. Superior Court* (1944) 25 Cal.2d 305, 312; *Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 500.)

Second, mother argues that the family court prejudged the dispute against her (1) because, at the time it denied mother's request for a permanent restraining order in early February 2020, the court issued an interim order placing Shyla with father as a means of effectively recompensing father "in light of the duration" that mother had obtained sole custody of Shyla before the TRO was dissolved; and (2) because the family court's findings in its order denying her request for a restraining order closely track its findings in the custody order. We are not persuaded. The court's February 2020 interim order was issued for reasons *other than* that the court thought father was going to prevail on his still-to-be-adjudicated request for sole custody. And even if it had been issued for that reason, trial courts grant provisional relief based on the likelihood of success all the time (*White v. Davis* (2003) 30 Cal.4th 528, 561); if this were enough to

24

constitute unconstitutional bias, such relief would be verboten.[8] Moreover, the fact that the family court's findings in denying mother's request a restraining order are similar to its findings in the custody order is not evidence of prejudgment; instead, it reflects that the evidence presented during both proceedings was similar. That the outcomes of both proceedings are consistent confirms nothing more than the rationality of the family court's evaluation of the evidence in father's favor.

Third, mother asserts that the family court's custody order granting father sole custody was some sort of retributive "punishment" for making her earlier request for a restraining order that the court found to be without merit. To be sure, a family court cannot use a custody order to "punish" a party. (*LaMusga*, *supra*, 32 Cal.4th at p. 1094.) But there is nothing to suggest—beyond sheer speculation—that the family court was so motivated here. The court's order entails nothing beyond a thorough examination of the evidence, including the parties' past conduct, which is a legitimate consideration. (*Ibid.* [family court "may . . . consider the past conduct of the parents"].) If, as mother seems to suggest, a trial court is deemed to be punishing a litigant any time the court has made an interim ruling against the litigant in the past, then given the number of interim rulings courts make, nearly every judge would be in the business of

<hr>

[8] Although mother repeatedly complains that the February 2020 interim order placing Shyla with father was also issued in violation of due process, mother simultaneously acknowledges that she never sought appellate review of that order and that any such violations are moot given that the family court has supplanted the interim order with the substantively similar custody order. Thus, we will not address mother's complaints about the procedural propriety or the merits of the interim order.

dispensing punishment and would on that basis be disqualified due to bias.[9]  That is simply not the law.

## II.  Sanctions Order

Mother argues that the family court's sanctions order is defective for two reasons.  First, mother argues that the court lacked the statutory authority to impose $8,539 of the $13,059 monetary award under section 3027.1 because father had already been awarded that amount as prevailing party attorney fees for successfully defending against her meritless request for a restraining order.  Second, mother argues that the court's full sanctions order of $34,414 was unsupported by the record.  Because the first challenge involves a question of statutory construction, our review is de novo.  (*Robert J. v. Catherine D.* (2009) 171 Cal.App.4th 1500, 1514 (*Robert J.*).)  As noted above, our review of the second challenge is for substantial evidence.

### A.  *Sanctions under section 3027.1*

Section 3027.1 provides that a family court may require a party who makes "an accusation of child abuse or neglect during a child custody proceeding" while knowing "it to be false at the time the accusation was made" to pay "reasonable money sanctions" as well as "reasonable attorney's fees incurred in recovering the sanctions."  (§ 3027.1, subd. (a).)  The "reasonable money sanctions" must not "exceed all costs incurred by the party accused as a direct result of defending the accusation," and are

---

[9]     Mother's briefing on appeal is not the first time she has hurled accusations of bias against the family court judge presiding over this dispute merely because the judge ruled in father's favor.  Indeed, mother filed three separate motions to disqualify the family court judge when mother realized the judge was well-versed in the case and attuned to mother's "troubling" conduct.

26

"in addition to any other remedy provided by law." (*Id.*, subds. (a) & (c).)

The family court here ordered mother to pay a "reasonable money sanction" of (1) $8,539 for making false allegations of abuse in the restraining order proceedings and (2) $1,800 for making false allegations of abuse in mother's June 2020 request for Shyla to be returned to her custody; the court also ordered mother to pay father $2,700 in "reasonable attorney's fees" he incurred in bringing the sanctions motion. The $8,539 amount corresponds with the amount of attorney fees the family court previously awarded father as the prevailing party in the restraining order proceedings. Mother argues that awarding father $8,539 in "reasonable money sanctions" under section 3027.1 after already awarding father the same amount as a prevailing party constitutes an impermissible double award of attorney fees. We disagree, chiefly because the court's award of "reasonable money sanctions" under section 3027.1 is *not* an award of attorney fees. Instead, it is a separate and nonduplicative award of monetary sanctions for making false accusations of abuse. (See *Robert J.*, *supra*, 171 Cal.App.4th at p. 1519 ["public policy underlying" the statute is to "discourag[e]" deliberately false accusations of child abuse "in order to gain custody of a minor child" and to "compensat[e]" a parent "wrongly accused of abuse"].) The fact that section 3027.1 caps the total amount of "reasonable money sanctions" at "the costs incurred by the party accused as a direct result of defending the accusation," and that the family court here looked to one component of those costs (namely, the attorney fees father incurred for his defense in the restraining order proceedings) does not somehow convert those sanctions into a duplicative attorney fees award. If there

27

were any doubt, section 3027.1's express proviso makes it clear that "reasonable monetary sanctions" a family court awards may be "in addition to any other remedy provided by law," which by its plain text would encompass the remedy of awarding a prevailing party its attorney fees. The text of the statute controls. (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1384-1385.)

### B. *Sufficiency of evidence supporting all sanctions*

As noted above, a court may award sanctions (and attorney fees incurred to obtain those sanctions) under section 3027.1 upon a finding that a person has made a "false" "accusation of child abuse or neglect" while knowing the accusation to be false. (§ 3027.1, subd. (a).) A court may also award a "sanction" of "attorney's fees and costs" on any party in a Family Code proceeding if the party or its attorney engages in "conduct . . . [that] . . . frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (§ 271, subd. (a).)

The family court here ordered $13,059 in sanctions under section 3027.1 (for the reasons noted above) and $21,375 in sanctions under section 271 (for mother's "protracted court proceedings" aimed at "disrupt[ing] father's relationship" with Shyla). Contrary to mother's arguments, and as detailed above, substantial evidence supports the family court's findings that mother made false accusations of abuse and otherwise engaged father in "protracted court proceedings." Mother responds with two arguments. She asserts that the family court never made a finding that she *knew* Shyla's allegations were false. This is incorrect, as the court found that "mother's finger-pointing and

28

evasiveness reveal her consciousness that, if her role in the origination of these abuse investigations was known to the court, it would cast grave doubt on her willingness and ability to prioritize [Shyla's] best interests and [to] support [Shyla's] relationship with her father. Put another way, the court conclude[d] that mother knows that what she has been doing is wrong, or at least that the court would think it is." Mother also asserts that there was insufficient evidence that mother *knew* Shyla's allegations against father were false because some of the persons Shyla reported to believed Shyla; however, the fact that mother induced Shyla to lie convincingly does not mean that mother was unaware of the falsity of Shyla's reports of abuse. Mother also asserts that the family court was wrong to look at anything beyond the original nugget of father's initial December 2019 petition involving mother's violation of the exit order by picking up Shyla from school and gymnastics when she was not supposed to; for the reasons described above, the genie mother and father unleashed in the custody proceedings growing out of that petition cannot be stuffed back into that tiny lamp.

## III.  Move-away Order

At the time father sought the family court's permission to move with Shyla to Virginia, father had been Shyla's sole legal and physical custodian for six months. As the parent with such sole custody, father is presumptively empowered to change Shyla's residence unless "the move would result in [a] detriment to [her]." (*Brown, supra*, 37 Cal.4th at p. 957; § 7501, subd. (a) ["A parent entitled to the custody of a child has a right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child."].)  The parent opposing the move bears the "initial

29

burden" of showing detriment. (*LaMusga*, *supra*, 32 Cal.4th at p. 1078; *Brown*, at pp. 959-960.) For these purposes, a showing of "detriment" requires proof of something more than "detriment in the abstract" (that is, more than "generalities concerning the standard of living and schooling" in the new locale). (*Brown*, at pp. 963, 964.) If, and only if, the opposing parent shows that the move would be detrimental is the family court then obligated to "perform the delicate and difficult task" of determining whether the move is in the "best interest[] of the child." (*LaMusga*, at p. 1078.) If the family court opts to change the custodian of the child so the child does not have to move, the court must consider several factors in assessing whether that change of custody is in the child's best interest, including (1) "the child's interest in stability and continuity in the custodial arrangement," (2) "the distance of the move," (3) "the child's age," (4) "the child's relationship with both parents," (5) "the relationship between the parents, including, but not limited, to, their ability to communicate and cooperate effectively and their willingness to put the child's interests above their individual interests," (6) "the child's wishes if the child is mature enough for such an inquiry to be appropriate," (7) "the reasons for the proposed move," and (8) "the extent to which the parents currently share custody." (*Id.*, at p. 1101.) A family court has broad discretion in evaluating whether a move will result in a detriment to the child, and what is in the best interest of the child. (*Brown*, at p. 961.)

Here, the family court determined that mother had not carried her burden of establishing that moving Shyla to Virginia would be to Shyla's "detriment." Mother argues that this determination was error because (1) it is unsupported by substantial evidence, and (2) it is procedurally defective because

30

the court (a) did not conduct an evidentiary hearing, (b) did not appoint Shyla separate counsel, and (c) did not appoint a custody evaluator.

## A. *Substantial evidence challenge*

Because mother bore the burden of establishing detriment, she can prevail on appeal in her substantial evidence-based challenge to the court's ruling only if she establishes that the evidence she presented compels a finding of detriment as a matter of law. (*Dreyer's Grand Ice Cream, Inc. v County of Kern* (2013) 218 Cal.App.4th 828, 838.)

Mother's showing of detriment does not compel a finding of detriment as a matter of law. In both her declaration and her testimony at the hearing, mother stated that Shyla was visibly upset during the conjoint counseling sessions, wanted to return to mother's full custody, and wanted to remain in California; that Shyla would be living in Virginia with one of father's relatives, who mother claimed was a person convicted of murder and recently released from prison; that the schools near the Virginia residence were not good schools; and that Shyla will no longer be able to participate in gymnastics in California. The declarations submitted by third parties on mother's behalf shared opinions that mother was the better parent and that father was a bad influence. Taking these items in reverse, the third party declarations have nothing to do with the detriment Shyla might face from moving to Virginia; Shyla's involvement in gymnastics in California is not a "trump card" that outweighs every other consideration, particularly where there is no evidence that Shyla will be prevented from participating in gymnastics in Virginia; mother's concerns about the quality of schooling (and even the quality of gymnastics programs) in Virginia constitutes

31

insufficient "detriment in the abstract"; mother's beliefs about who would be living with Shyla in Virginia, as well as their criminal histories, are speculative and necessarily based on inadmissible hearsay; and Shyla's distress during the conjoint therapy sessions establishes only that Shyla is continuing to act distressed whenever she is in mother's presence. Taken individually or collectively, this evidence—even if the inadmissibility issues are overlooked and mother's statements are accepted at face value—does not establish that moving Shyla to Virginia would cause her detriment *as a matter of law*. (Cf. *In re T.S.* (2020) 52 Cal.App.5th 503, 517-518 [allowing child to live with a "convicted felon" who was "not allowed to be around children" is evidence of detriment; it does not *compel* a finding of detriment].) Mother seems to argue that the family court erred in not evaluating the factors set forth in California Rules of Court, rules 5.240 and 5.113, but those rules address the factors relevant to the appointment of counsel for a child and to the need for an evidentiary hearing, respectively; they do not address the issue of detriment.

### B. *Procedural challenges*

#### 1. *Evidentiary hearing*

Section 217 erects a presumption in favor of holding an evidentiary hearing in Family Code proceedings where "live, competent testimony that is relevant and within the scope of the hearing" can be introduced. (§ 217, subd. (a).) A family court nevertheless may decline to hold an evidentiary hearing—or may limit the scope of such a hearing—upon a "finding of good cause." (*Id.*, subds. (a) & (b); *In re Marriage of George & Deamon* (2019) 35 Cal.App.5th 476, 482, fn. 7.) In assessing whether "good cause" to deny or limit an evidentiary hearing exists, a court

32

"must consider" the following factors: (1) "[w]hether a substantive matter is at issue—such as child custody . . ."; (2) "[w]hether material facts are in controversy"; (3) "[w]hether live testimony is necessary for the court to assess the credibility of the parties or other witnesses"; (4) "[t]he right of the parties to question anyone submitting reports or other information to the court"; (5) "[w]hether a party offering testimony from a non-party" has provided the opposing party with a "witness list with a brief description of the anticipated testimony"; and (6) "[a]ny other factor that is just and equitable." (Cal. Rules of Court, rule 5.113(b); § 217, subd. (c).) With regard to the third factor, live testimony is not necessary in proceedings regarding a possible move-away order if the party requesting the evidentiary hearing "is unable to make a prima facie showing of detriment in the first instance"—that is, if the parent's "allegation or showing of detriment to the child [from the move] is insubstantial in light of all of the circumstances presented in the case, or is otherwise legally insufficient to warrant relief." (*Brown, supra*, 37 Cal.4th at p. 962.)

Because the family court in this case allowed mother to testify, the court held an evidentiary hearing. As a result, the only issue before us is whether the family court abused its discretion in limiting the evidentiary hearing that was held by not allowing mother to call *other* witnesses. (See *People v. Waidla* (2000) 22 Cal.4th 690, 717 [decision to exclude evidence reviewed for abuse of discretion]; cf. *In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843-1845 [mandate to consider all "'relevant and material evidence as may be offered'" is not literal or absolute, but rather subject to court's exercise of discretion and Evidence Code section 352].) There was no abuse of discretion.

33

Although the substantive topic of Shyla's custody was at issue (the first factor) and mother provided in advance summaries of her witnesses' anticipated testimony (the fifth factor), there were no facts in controversy as to detriment (because the court accepted at face value mother's representations that Shyla said she wanted to live with mother in California, that the schools and gymnastics programs in Virginia were worse) (the second factor), and mother did not need a hearing to question the authors of any reports (the fourth factor). Most importantly, the family court did not abuse its discretion in concluding that further live testimony was not needed (the third factor). Mother stated that *she* was the "primary witness" as to detriment, and the family court let her testify. The testimony of the remaining witnesses was either derivative of what mother already testified to, or was relevant to the propriety of the custody order rather than whether the move would result in detriment to Shyla.

Mother marshals four further arguments in response. First, she argues that Shyla should testify because mother does not have unregulated access to Shyla under the custody order. However, mother already testified to what Shyla said and felt; having Shyla take the stand and repeat it adds nothing, as the family court noted. (Evid. Code, § 352 [discretion to exclude cumulative evidence].) Second, mother argues that there was good reason to question and to disbelieve father's representations in his move-away petition. However, impeaching father does not establish detriment to Shyla from the move. Third, mother argues that she made her prima facie showing by merely *alleging* that the move would cause a detriment. However, the phrase "prima facie showing" is used in many contexts. Here, it requires more than a blanket allegation; *Brown* establishes that it

34

requires a more specific explanation of why moving Shyla would result in more than a detriment in the abstract, and mother failed to make that showing. Fourth, mother argues that she needed an evidentiary hearing to develop more evidence. However, that is not the way it works. An evidentiary hearing is not a tool for rooting around in the proverbial dark to locate evidence; it is a means of resolving factual disputes that are shown to exist and are shown to be material to the issue at hand. The family court did not abuse its discretion in finding that there were no such disputes that would be resolved by calling the additional witnesses mother sought to call, particularly in light of the absence of meaningful proffers as to what these witnesses would add to the body of evidence already before the court regarding the detriment to Shyla.

### 2. *Appointment of counsel for Shyla*

A family court has the discretion to appoint counsel for a child if doing so "would be in the best interest of the minor." (§ 3150, subd. (a); *In re Marriage of Metzger* (2014) 224 Cal.App.4th 1441, 1446 (*Metzger*).) In considering whether to appoint counsel for a child, the court "should take into account" several factors, including "whether (1) [t]he issues of child custody and visitation are highly contested or protracted; (2) [t]he child is subjected to stress as a result of the dispute that might be alleviated by the intervention of counsel representing the child; (3) [c]ounsel representing the child would be likely to provide the court with relevant information not otherwise readily available or likely to be presented; (4) [t]he dispute involves allegations of physical, emotional, or sexual abuse or neglect of the child; (5) [i]t appears that one or both parents are incapable of providing a stable, safe, and secure environment; (6) [c]ounsel is available for

35

appointment who is knowledgeable about the issues being raised regarding the child in the proceeding; [and] (7) [t]he best interest of the child appears to require independent representation." (Cal. Rules of Court, rule 5.240(a).)[10] The appointment of counsel is reviewed for an abuse of discretion. (*Metzger*, at p. 1450.)

The family court did not abuse its discretion in declining to appoint separate counsel for Shyla. The move-away proceeding did not occur in a vacuum; instead, it came less than a year after a protracted, 11-day evidentiary hearing where the true and full extent of mother's orchestration and manipulation of Shyla came to light. Tellingly, no one had requested counsel for Shyla during that prior proceeding; indeed, when the court inquired whether counsel for Shyla should be appointed during the restraining order proceedings, mother rejected the idea. Given this history, the family court acted within its discretion in finding that the appointment of counsel *at this stage* would do little more than insert a new third party into the fray who would need to get up to speed on nearly a decade of litigation when Shyla's differing attitudes towards father (depending on whether mother was present) was already part of the record. The propriety of the family court's ruling is confirmed by examining the pertinent factors. Although the subject of the hearing (child custody) and the fact that mother had been found to be incapable of providing a stable and secure environment favored the appointment of counsel, the facts that appointment of counsel would likely increase Shyla's stress, that new counsel would not likely provide additional information over and above what Shyla had already been represented to believe, and that the appointment of counsel

---

10      There is an eighth factor when multiple children are involved, but it is not relevant here.

36

would protract these proceedings even further counseled against the appointment of counsel.  Mother urges that counsel for Shyla could have doubled as an investigator of sorts to support mother's case, but this argument simply confirms the family court's chief concern—namely, that mother was requesting the appointment of counsel to effectively hit the reset button on the already-litigated custody order.

3.    *Appointment of custody evaluator*

A family court also has the discretion to appoint a "custody evaluator" to examine whether to make an order changing a child's custody.  (*In re Marriage of Winternitz* (2015) 235 Cal.App.4th 644, 649; Evid. Code, § 730; Cal. Rules of Court, rule 5.220.)  The family court did not abuse its discretion in not appointing a custody evaluator in this case given that the court had recently conducted extensive hearings on Shyla's proper placement and that the issue underlying the move-away request was the much narrower, threshold question of whether the move would be detrimental to Shyla (rather than whether to transfer her to mother's custody should that detriment be found to exist).

## DISPOSITION

The custody, move-away, and sanctions orders are affirmed.  Father is entitled to his costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ